FILED

Oct 25 2018, 8:32 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Alex E. Gude
Meaghan Klem Haller
Bingham Greenebaum Doll, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregg S. Gordon
Dale & Eke, PC
McCordsville, Indiana

Erick P. Knoblock
Dale & Eke, PC
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re the Matter of the Trust of Barbara J. Rawlings

Rex R. Rawlings,

*Appellant-Petitioner,*

v.

Kim R. Rawlings,

*Appellee-Respondent.*

October 25, 2018

Court of Appeals Case No.
18A-TR-345

Appeal from the Clinton Circuit Court

The Honorable Brad Mohler, Judge

Trial Court Cause No.
12C01-1412-TR-110

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Petitioner, Rex R. Rawlings (Rex), appeals the trial court's summary judgment in favor of Appellee-Respondent, Kim R. Rawlings (Kim), granting equitable relief to Kim by enforcing the agreement between the parties in the termination and division of a trust.

We affirm.

# ISSUE

Rex raises three issues on appeal, which we consolidate and restate as the following single issue: Whether the trial court properly concluded that Kim is entitled to equitable relief in the division of the trust assets.

# FACTS AND PROCEDURAL HISTORY

On August 11, 1981, Anna Blanche Hillis (Hillis) established the Hillis Land Trust (Hillis Trust), with a sole asset of 422.803 acres of real estate (Hillis Land). At the time the Hillis Trust was established, 10,000 units were apportioned between the various beneficiaries, with the majority of the units held by Hillis. Hillis passed away in November 1983, and pursuant to her Last Will and Testament, the interest in the Hillis Trust passed into testamentary trusts established for the benefit of her daughters, Barbara Rawlings (Barbara), the mother of Rex and Kim, and Julia Wilkinson (Julia). In 1984, Rex and his wife, Colleen Rawlings (Colleen), entered into a promissory note to acquire Julia's 50% interest in the Hillis Trust. This promissory note was secured by mortgages from Barbara's husband, Richard Rawlings (Richard), and Rex on

201.12 acres of the Hillis Land. On March 21, 1988, Richard and Barbara signed a personal guarantee on behalf of Rex and Colleen with the Summit Bank of Clinton County for a secured amount of $311,515.79. As a result of the guarantee, Richard and Barbara became jointly and severally liable for Colleen's and Rex's "each and every debt, of every type and description, that [they] may now or at any time in the future owe[.]" (Appellant's App. Vol. III, p. 5). The Hillis Trust was not subject to the personal guarantee. Accordingly, by November 1988, members of the Rawlings family had become the only beneficiaries of the Hillis Trust through a buyout of the Wilkinson family by way of promissory notes secured by mortgages on part of the Hillis Land. Only 227 acres of the land remained unencumbered by mortgages or other encumbrances.

[5] In an effort to release Barbara and Richard from their personal guarantee for Colleen and Rex's debts, Rex proposed to terminate the Hillis Trust and to mortgage the real estate therein. As a result, the Rawlings family could then allow the unencumbered portion of the real estate to be used as collateral to secure Colleen and Rex's debts, and Barbara and Richard would be released from their personal guarantee. However, to be successful, Rex required the consent of all beneficiaries of the Hillis Trust, including Rex's brother, Kim, and Kim's wife, Deborah Rawlings (Deborah).

[6] It is undisputed that at that point, Kim and his family were vested beneficiaries of the 2,321 units of the Hillis Trust (either directly or as a remainder beneficiary of Barbara's testamentary trust). Therefore, if the Hillis Trust had

terminated at that moment and the real estate divided among the beneficiaries based on their unit ownership, Kim and his family would have been entitled to receive 121.09 acres of real estate.

[7] In order to safeguard his inheritance, Kim agreed to allow Rex to terminate the Hillis Trust and to use the land as collateral for Rex's financial obligations in exchange for the execution of an agreement stipulating to the parties' respective rights and obligations. On November 28, 1988, Kim and Rex entered into the Inheritance Agreement, which provided, in relevant part, that Rex "is desirous of having the [Hillis Trust] terminated and having all of the beneficiaries to said Trust receive their undivided interest in the assets of said Trust[.]" (Appellant's App. Vol. IV, p. 3). To pursue his goal, it was Rex's "intent to borrow certain sums of money and obtain a mortgage on the real estate currently held by the [Hillis Trust] and the undersigned parties acknowledge that in effect this is an advance on [Rex's] inheritance." (Appellant's App. Vol. IV, p. 3). In exchange, Kim agreed to

> sign all necessary documents to allow [Rex] along with his wife, [Colleen], to serve as successor Co-Trustees to the [Hillis Trust] for the sole purpose of terminating said Trust and distributing the assets in said Trust to the beneficiaries of said Trust. And [Kim] further agrees to consent to a mortgage being placed on the land which is presently owned by the [Hillis Trust] and [Rex] agrees that should a mortgage balance remain on the property which is currently owned by the [Hillis Trust] at the death of the survivor of [Barbara] and [Richard], then said mortgage balance shall be paid before [Rex] shall receive his inheritance from [Barbara] and [Richard] or a credit in favor of [Kim] in the amount of the mortgage balance owing shall be made prior to any distribution

from the estates of [Barbara] and [Richard]. Parties further state that the purpose of this document is to insure that [Kim] and [Rex] are treated as equally as possible in the estates of their parents.

(Appellant's App. Vol. IV, pp. 3-4).

[8] Upon the execution of the Inheritance Agreement, Rex and Colleen filed their petition of beneficiaries to docket the Hillis Trust, clarify title to property and terminate the Hillis Trust. On December 2, 1988, the Hillis Trust was terminated by court order and four days later, on December 6, 1988, Rex and Colleen, as co-trustees of the Hillis Trust, conveyed the Hillis Land to the Rawlings family.

[9] Richard passed away on December 16, 1988, and an estate was opened. Barbara was appointed the personal representative of the estate and in February of 1989, Summit Bank filed a contingent claim for the amount of $311,515.79 as secured by the personal guarantee. To resolve the debt, on March 29, 1989, Kim and Deborah, in accordance with the Inheritance Agreement, executed, along with Rex and Colleen, an indemnifying mortgage on the Hillis Land, as well as on other certain real estate held by Barbara's testamentary trust, to Summit Bank, in order

> to induce Mortgagee to renew existing indebtedness, to make new loans, and to secure the due and punctual payment of all such indebtedness of [Rex and Colleen], husband and wife, hereinafter called 'Borrower', to Mortgagee whether now existing or hereinafter incurred, including all renewals and extensions thereof, not to exceed an aggregate principal amount of

[$600,000] and all interest accrued thereon and fees and expenses of Mortgagee incurred in connection therewith, all without relief from valuation and appraisement laws.

(Appellant's App. Vol. III, p. 111). A second indemnifying mortgage on the Hillis Land and other real estate held by Barbara's testamentary trust was executed in favor of Summit Bank on May 13, 1992.

[10] On October 12, 1990, Barbara executed a Revocable Trust, which included certain real estate located in Clinton County and Tipton County, Indiana. Barbara executed several Amendments to the Revocable Trust, of which the Second Amendment, executed on July 22, 2002, included the following language:

> Settlor hereby declares that she has helped each of her sons financially and otherwise over the years, but she hereby states that she does not consider there to be any debt owed to her, her estate, or this Trust by either son or their respective issue. Successor Trustees [Kim and Rex] are directed to make distribution of the Trust assets without trying to take into consideration any assets heretofore given or advances to either of said sons or their respective issue.

(Appellant's App. Vol. II, p. 34).

[11] Rex and Colleen failed to satisfy their financial commitments, and on January 27, 1995, NBD Bank, N.A. (NBD Bank), successor in interest to Summit Bank, filed an action to foreclose on the mortgages. Less than a month after NBD Bank filed its foreclosure action, Rex and Colleen filed for bankruptcy. Neither Kim nor Deborah were listed as creditors in the bankruptcy proceedings. As

part of the bankruptcy proceedings, Rex and Colleen were obligated to endeavor to sell 237 acres of real estate previously held by the Hillis Trust and by Barbara's testamentary trust. Accordingly, the Hillis Land and the real estate in Barbara's testamentary trust was quitclaimed to Rex and Colleen in late 1995, and on May 22, 1996, most of the land was sold to satisfy Rex and Colleen's indebtedness. NBD Bank, after being paid an amount of $875,000, released the mortgages. Rex and Colleen retained 11 acres of the Hillis Land that had been quitclaimed to them but which was not sold to satisfy their debt to NBD Bank.

[12] Barbara passed away on October 9, 2013. Both Rex and Kim became co-successor trustees of Barbara's Revocable Trust. On December 31, 2014, Rex filed his petition to docket the trust with the trial court, with a request to appoint a successor trustee because the co-successor trustees "cannot work together." (Appellant's App. Vol. II, p. 20). On January 9, 2015, Kim filed his objection to the appointment of a successor trustee and served Rex, in his capacity as a beneficiary of the Trust, with a summons and a copy of the objection. Kim requested the trial court for an order compelling the final distribution of Barbara's Revocable Trust, as well as for equitable relief by asking the trial court to enforce the Inheritance Agreement upon the distribution of the Trust assets. Specifically, Kim explained, in pertinent part:

> 36. Rex received a substantial benefit from Kim since Rex was able to use the Hillis Land as collateral for Rex's debts. Without Kim's agreement, Rex would not have been able to mortgage the Hillis Land.

37. In exchange for that benefit, Rex promised that Kim would receive his portion of the Hillis Land free and clear of such encumbrances *or* that Kim would receive a credit for the amount of such encumbrances. This cannot occur since the Hillis Land was sold to a third party.

38. Rex received a substantial benefit from Kim, and absent an adjustment of the distribution of the remaining Trust assets, Kim will lose the value of his bargain with Rex. This is precisely the type of situation where equity intercedes to prevent an unjust result.

* * * *

40. If the Hillis Land had not been mortgaged, Kim and Rex would now each be entitled to receive some 200 acres of real estate. But Rex mortgaged the Hillis Land for his personal benefit and, because Rex did so, some 221 acres was deeded to him so that it could be sold in the Bankruptcy to service his individual debts. If the Hillis Land was in the Trust, both Kim and Rex would each receive some 200 acres. In other words, when the Hillis Land was encumbered and then deeded to Rex, Rex received a benefit that *exceeded* the value of the inheritance he would otherwise now be entitled to receive if the Hillis Land was still in the Trust.

41. Directing that Rex's share of the remaining Trust assets be distributed to Kim, will restore a portion of that benefit that Rex received, affect the intent of the Inheritance Agreement and prevent an unjust result.

(Appellant's App. Vol. II, pp. 47-48).

[13] On January 29, 2015, Rex filed a motion to enlarge time to file his response to Kim's objection because he needed "additional time to respond to the allegations that constitute a [C]omplaint." (Appellee's App. Vol II, p. 7). Thereafter, on February 27, 2015, Rex filed his motion to dismiss for failure to state a claim upon which relief can be granted. In his motion, Rex argued that Kim's objection failed to state a claim because 1) the Inheritance Agreement only contemplated that a balance would be owing on the mortgage; 2) the Inheritance Agreement failed to include a requirement to deed any real estate back to Kim; 3) the intent of the Inheritance Agreement was to ensure that Kim and Rex would be treated equally in the estate of their parents while the instant proceeding did not originate from an estate; and 4) the provision of the Second Amendment to the Trust sought an equal distribution to Rex and Kim.

[14] On June 12, 2015, the trial court conducted a hearing on Rex's motion to dismiss and subsequently entered an order denying that motion on September 9, 2015. At the same time, the trial court also docketed Barbara's Revocable Trust and appointed the Farmers Bank as the successor trustee of the Trust. On September 21, 2015, Rex filed his answer to Kim's request compelling a final distribution of the Trust and asserted a counterclaim request to investigate whether Kim had breached his fiduciary duties as a co-successor trustee to the Revocable Trust. On October 14, 2016, Kim filed his reply to the counterclaim, denying all allegations.

[15] On June 24, 2016, Kim filed his motion for summary judgment, together with a memorandum and designation of evidence. On July 25, 2016, Rex filed his

response and designation of evidence, as well as a motion to strike certain portions of Kim's and Deborah's affidavits submitted as part of Kim's designated evidence. On August 30, 2016, Kim filed a response to the motion to strike.

[16] On January 2018, after a hearing, the trial court granted summary judgment to Kim, concluding, in pertinent part:

> 9. That, in summary, unless equity intercedes to [] enforce the [Inheritance Agreement], [Rex] would receive numerous benefits to the detriment of [Kim], *i.e.*, obtaining land from the Hillis Trust, using [Kim's] land from the Hillis Trust as collateral for his debts, having his debts discharged through bankruptcy, receiving an equal amount of the remaining Hillis Land despite the fact that his financial hardships caused much of the land to be sold to pay his debts, and not being bound by the [Inheritance Agreement]. Equity should not allow such an injustice, but rather, equity should do what should be done.
>
> 10. That the language contained in the Second Amendment to the Barbara Rawlings Revocable Trust, executed on July 22, 2002, is not dispositive of the issues, as such language does not alter or vacate the terms agreed upon by [Rex] and [Kim] in the [Inheritance Agreement].
>
> 11. That the [c]ourt therefore concludes that the real estate now owned by Barbara Rawlings' Trust should be divided equally between [Kim] and [Rex]. After such division, and before final distribution from Barbara Rawlings' Trust, up to 121.09 acres of real estate which would otherwise be distributed to [Rex] as part of his share of Barbara Rawlings' Trust shall be credited and distributed to [Kim] along with his one-half share of Barbara Rawlings' Trust.

(Appellant's App. Vol. II, pp. 17-18) (internal citation and references omitted).

Rex now appeals. Additional facts will be provided if necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *First Farmers Bank & Trust Co. v. Whorley*, 891 N.E.2d 604, 607 (Ind. Ct. App. 2008), *trans. denied*. Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Id*. at 607-08. In doing so, we consider all of the designated evidence in the light most favorable to the non-moving party. *Id*. at 608. A fact is 'material' for summary judgment purposes if it helps to prove or disprove an essential element of the plaintiff's cause of action; a factual issue is 'genuine' if the trier of fact is required to resolve an opposing party's different version of the underlying facts. *Ind. Farmers Mut. Ins. Group v. Blaskie*, 727 N.E.2d 13, 15 (Ind. 2000). The party appealing the grant of summary judgment has the burden of persuading this court that the trial court's ruling was improper. *First Farmers Bank & Trust Co.*, 891 N.E.2d at 607. When the defendant is the moving party, the defendant must show that the undisputed facts negate at least one element of the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense that bars the plaintiff's claim. *Id*. Accordingly, the grant of summary judgment must be

reversed if the record discloses an incorrect application of the law to the facts. *Id*.

[19] We observe that, in the present case, the trial court entered findings of fact and conclusions of law in support of its judgment. Special findings are not required in summary judgment proceedings and are not binding on appeal. *AutoXchange.com. Inc. v. Dreyer and Reinbold, Inc.*, 816 N.E.2d 40, 48 (Ind. Ct. App. 2004). However, such findings offer this court valuable insight into the trial court's rationale for its review and facilitate appellate review. *Id*

## II. *Equitable Relief*

[20] Rex contends that the trial court erred in finding no genuine issues of material fact and issuing summary judgment to Kim. As this cause initially commenced as a petition to docket the Trust and to appoint a successor trustee, Rex asserts that the trial court exceeded the scope of its limited probate proceedings by issuing a division of the Trust corpus in accordance with the terms of the Inheritance Agreement. Focusing on Barbara's Revocable Trust, Rex maintains that the trial court, by applying the Inheritance Agreement, disregarded Barbara's intent of dividing the assets of the Trust equally between Rex and Kim. In essence, he claims that the trial court re-wrote the Trust instrument based on the Inheritance Agreement.

[21] Initially, we note that the trial court, sitting as a probate court, had the authority to hear and decide this particular cause and to grant the requested relief. The probate jurisdiction conferred upon circuit courts is separate and distinct from

their general jurisdiction in civil causes, and the methods of proceeding in the exercise of such probate jurisdiction are equally separate and distinct from those prescribed by the code of civil procedure in ordinary causes. *Cmty. Hosps. of Ind., Inc. v. Estate of North*, 661 N.E.2d 1235, 1239 (Ind. Ct. App. 1996). It is only where the probate code does not provide an adequate and complete mode of procedure that it is proper to resort to the rules of pleading and practice applicable to civil actions. *Id.* However, probate courts must also be considered courts of general jurisdiction. *Id.* They are courts of record and, by the act under which they were organized, in the exercise of the jurisdiction granted to them, are vested with the incidental powers of other courts of law and equity. *Id.* With regards to probate matters, the *North* court pointed out that:

> We agree that the administration of an estate is a single proceeding in rem. During the course of the administrative proceeding, however, collateral proceedings may occur which are adversarial in nature and result in separate decisions finally adjudicating the rights of interested persons. Again, under these circumstances, the probate code directs the probate court to the rules of pleading and practice applicable in ordinary civil cases. Even if the Estate's counterclaim addresses matters outside the rem of the Estate and even if potential class members are not part of the Estate, under the rules just mentioned, those matters are merely collateral to the administration of the Estate and do not affect the jurisdiction of the court with regard to the particular case before it.

*Id.* at 1241. Even though *North* is an estate case, we find the same holds true for trust proceedings. *See Matter of Trust of Loeb*, 492 N.E.2d 40, 43 (Ind. Ct. App.

1986) (noting that probate courts possess general equity powers, which include the authority to supervise and control the administration of trusts).

[22] Rex invoked the Clinton County court's probate jurisdiction when he docketed the Trust and sought to get a successor trustee appointed. Kim, in accordance with Ind. Code § 30-4-6-5,[1] filed his petition seeking the termination of the Trust and a distribution of the assets in accordance with the Inheritance Agreement. Pursuant to I.C. § 30-4-6-6(b),[2] he served Rex the filing along with a summons. Although the cause commenced as a trust proceeding, the insertion of the Inheritance Agreement is a collateral proceeding which affects the Trust's rem and can be pled before the trial court sitting in the probate matter in accordance with the Indiana Rules of Procedure. *See North*, 492 N.E.2d at 43. At no point did Rex object to the consideration of the Inheritance Agreement; rather, to the contrary, he obtained an extension of time "to respond to the allegations that constitute a [C]omplaint" and subsequently moved to dismiss the pleading, which was denied by the trial court. (Appellant's App. Vol. II, p. 7). As the purported enforcement of the Inheritance Agreement is a collateral issue and might affect the parties' inheritance, the trial court had jurisdiction to consider Kim's allegation.

---

[1] Indiana Code section 30-4-6-5 provides that "[a]ny proceedings under this article [i.e., the Trust code] may be initiated on either a petition or complaint and upon notice as provided in [I.C. §] 30-4-6-6."

[2] Indiana Code section 30-4-6-6(b), specifies, in pertinent part, that the form of notice required "shall be in the form of a summons as provided in the Indiana Rules of Procedure for service of summons[.]"

[23] Turning to the merits of his claim, Rex now argues that the trial court used the Inheritance Agreement to re-write the unambiguous language of Barbara's Revocable Trust and to impose a division of the corpus inconsistent with Barbara's express wishes. While Kim agrees that the Inheritance Agreement cannot be used to re-write the terms of the Trust, in a similar vein it should be noted that the Trust cannot be used to re-write the Inheritance Agreement. Both documents are separate and distinct agreements, each with a different purpose and parties. Rex does not contest the validity of either instrument.

[24] The Revocable Trust provides for the equal distribution of the assets between Rex and Kim, "share and share alike," upon Barbara's death—at which time the Trust "shall terminate." (Appellant's App. Vol. II, p. 40). Also, during the lifetime of the Trust, "no beneficiary shall have any power to sell, assign, transfer, encumber or in any other manner to anticipate or dispose of his or her interest in the Trust estate or in the income produced thereby[.]" (Appellant's App. Vol. II, p. 26). In sum, it was Barbara's intent that there was no "debt owed to her, her estate, or this Trust by either son or their respective issue. Successor Trustees [Kim and Rex] are directed to make distribution of the Trust assets without trying to take into consideration any assets heretofore given or advanced to either of said sons or their respective issue." (Appellant's App. Vol. II, p. 34).

[25] The Inheritance Agreement, executed prior to the establishment of Barbara's Revocable Trust, recognized that both Rex and Kim would be beneficiaries of the Hillis Trust. It provided that Rex's termination of the Hillis Trust and

encumbering of the Hillis Land would be "in effect [] an advance on [Rex's] inheritance." (Appellant's App. Vol IV, p. 3). The parties agreed that "should the mortgage balance remain on the property which is currently owned by the Hillis Land Trust at the death of the survivor of [Barbara] or [Richard], the said mortgage shall be paid before" Rex shall receive his inheritance from Barbara and Richard or a credit in favor of Kim in the amount of the mortgage balance owing shall be made prior to any distribution from the estate of Barbara and Richard. (Appellant's App. Vol. IV, p. 3). The Inheritance Agreement clearly expressed its intended purpose of treating Kim and Rex "as equally as possible in the estates of their parents." (Appellant's App. Vol. IV, p. 4). Although the Inheritance Agreement sought to protect Kim's vested interest in the Hillis Land and operated to ensure that Rex would not receive a windfall from receiving his inheritance early, the agreement did not address the situation if the mortgage on the Hillis Land would be foreclosed upon.

[26] Rex now seizes on this omission to claim that the Inheritance Agreement is inapplicable and the trial court erred in enforcing it. However, it is a well established premise that "when an express contract does not fully address a subject, a court of equity may impose a remedy to further the ends of justice. Stated another way, the existence of a contract, in and of itself, does not preclude equitable relief which is not inconsistent with the contract." *Coppolillo v. Cort*, 947 N.E.2d 994, 998 (Ind. Ct. App. 2011).

[27] By executing the Inheritance Agreement, Rex received a substantial benefit to the detriment of Kim's vested interest in the Hillis Land. Specifically, by

signing the Inheritance Agreement, Kim allowed Rex to use all the Hillis Land, in which Kim had a vested interest, as collateral for a mortgage to satisfy Rex's personal financial problems. As such, the Inheritance Agreement occurred outside the estate planning of Richard and Barbara and cannot be considered a debt to Barbara or to the Revocable Trust, but rather created a debt between Rex and Kim. In order to satisfy this debt, the Inheritance Agreement specified that the encumbrance of the Hillis Land, including the 121.09 acres which would have been passed to Kim and his family, would be "in effect" an advance on Rex's inheritance. (Appellant's App. Vol. IV, p. 3). Because he was allowed to mortgage the Hillis Land, Rex was able to borrow approximately $600,000 and to have that debt discharged by the sale of the encumbered real estate which included the 121.09 acres of real estate which was otherwise owned by Kim and his family. The Inheritance Agreement also specified that an equalization of their respective inheritances would only occur following the death of their last surviving parent and in conjunction with the parents' estate plan.

[28] Accordingly, upon Barbara's death, the Revocable Trust terminated, and a division of the corpus had to be made in accordance with the Trust provisions, while at the same time, the Inheritance Agreement had become enforceable. In harmonizing both the Trust and the Inheritance Agreement, the trial court viewed both documents as independent of each other, first mandating the division of the Trust and then almost simultaneously applying the Inheritance Agreement in equity. As "equity looks to the substance and not the form," the

Inheritance Agreement sought to safeguard Kim's inheritance while at the same time helping his brother. *Walter v. Balogh*, 619 N.E.2d 566, 568 (Ind. 1993). Because Rex defaulted on his financial obligations and the Hillis Land was foreclosed upon, "a court of equity has the power to require that to be done which should have been done." *Id.* Accordingly, upon the termination and division of the Revocable Trust, the trial court mandated the distribution of the assets of the Trust in accordance with Barbara's wishes, while immediately the court ordered up to 121.09 acres of real estate otherwise transferred to Rex under the provisions of the Trust to be credited and distributed to Kim, along with his 50% interest in the Trust rem. We find that there is no genuine issue of material fact and the trial court properly applied the law.[3]

---

[3] In addition, Rex makes several arguments which are waived for our review. First, Rex contends that the trial court in its summary judgment improperly relied on inadmissible portions of the affidavits designated by Kim and Deborah, thereby ignoring Rex's motion to strike. He maintains that because the trial court failed to rule on the motion to strike, it is unclear whether and to what extent the court considered inadmissible evidence in ascertaining the purpose of the Inheritance Agreement and therefore, a reversal is warranted. However, the trial court's judgment does not indicate that the court considered the affidavits; rather, the trial court merely enforced both agreements. Furthermore, Rex's argument presupposes that the statements in the affidavits are inadmissible but his appellate brief omits a cogent argument on the bases on which these statements would be considered inadmissible. Accordingly, this argument is waived. *See* Ind. Appellate Rule 46(A)(8). Similarly, Rex contends that Kim's request for equitable relief was barred by the Statute of Limitations. This argument was not raised before the trial court during the summary judgment proceeding even though it was raised as an affirmative defense by Rex in his Answer. Failure to raise this defense in the summary judgment proceeding resulted in a waiver of the non-asserted affirmative defense. *See Reisweg v. Statom*, 926 N.E.2d 26, 31 (Ind. 2010) (holding that a party is required to assert affirmative defenses in response to a motion for summary judgment that would dispose of the case).

# CONCLUSION

[29] Based on the foregoing, we hold that the trial court properly concluded that Kim is entitled to equitable relief in the division of the Trust assets and by enforcing the Inheritance Agreement.

[30] Affirmed.

[31] Kirsch, J. concurs

[32] Vaidik, C. J. dissents with separate opinion

# IN THE
# COURT OF APPEALS OF INDIANA

In Re the Matter of the Trust of
Barbara J. Rawlings

Rex R. Rawlings,

*Appellant-Petitioner,*

v.

Kim R. Rawlings,

*Appellee-Respondent.*

Court of Appeals Case No.
18A-TR-345

**Vaidik, Chief Judge, dissenting.**

[33] I respectfully dissent. Once the trial court took it upon itself to administer the Trust, its tasks were to (1) determine Barbara's intent and (2) give effect to that intent. *See Goodwine v. Goodwine*, 819 N.E.2d 824, 829 (Ind. Ct. App. 2004); *In re Valma M. Hanson Revocable Trust No. 103-83-1*, 779 N.E.2d 1218, 1221 (Ind. Ct. App. 2002), *reh'g denied*, *trans. denied*. The trial court completed the first task, acknowledging that Barbara's intent was that the property in the Trust

"would pass equally to Rex Rawlings and Kim Rawlings." Appellant's App. Vol. II p. 13. Having done so, however, the court did not complete the second task. Instead of giving effect to Barbara's clear intent, the court ordered that the trust assets be divided in accordance with Rex and Kim's "Agreement"—an agreement that Barbara was not a party to, that was executed two years before Barbara established the Trust, and that is not mentioned in the trust instrument or the amendments thereto. The court concluded that the agreement entitled Kim to "equitable relief" from the plain language of the Trust. *Id.* at 16.

[34] In affirming the trial court's decision, the majority relies heavily on this Court's opinion in *Community Hospitals of Indiana, Inc. v. Estate of North*, 661 N.E.2d 1235 (Ind. Ct. App. 1996), *trans. denied*. But that opinion said nothing at all about the authority of a court sitting in probate to grant a party equitable relief from the terms of a will or trust. Rather, we held that a probate court administering an estate had authority to adjudicate the estate's counterclaim against a creditor that had made a claim against the estate. *Id.* at 1240. We based that decision not on any general principle of "equity" but on Indiana Code sections 29-1-14-12 and -13, two provisions of Indiana's Probate Code that specifically contemplate counterclaims by estates against creditors. Here, neither Kim nor the trial court nor the majority has identified any similar statute, either in the Probate Code (Ind. Code art. 29-1) or the Trust Code (Ind. Code art. 30-4), that gave the trial court authority, in this proceeding relating to Barbara's trust, to adjudicate Rex and Kim's rights under their separate agreement. Absent such statutory authority, I would hold that the trial court,

sitting in probate, had no business adjudicating Kim's claim under that agreement.

[35]     I do not mean to suggest that Rex and Kim's agreement is void or that Kim cannot seek to enforce it in a separate proceeding. I would merely hold that the interpretation and enforcement of the agreement—again, an agreement that Barbara was not a party to, that was executed two years before Barbara established the Trust, and that is not mentioned in the trust instrument or the amendments thereto—are matters that fall outside the scope of the trust proceeding initiated by Rex.